UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BRENDA COMBS,                     )
                                  )
               Plaintiff          )
                                  )
         v.                       )        Cause No. 1:19-CV-4851 RLM-MG
                                  )
R1 RCM, Inc.,                     )
               Defendant          )

OPINION AND ORDER

R1 RCM, Inc., fired Brenda Combs in March 2018. She sued, alleging that
R1 violated the Americans with Disabilities Act by failing to provide reasonable
accommodation and retaliating against her. R1 has moved for summary
judgment on both claims and Ms. Combs has moved for partial summary
judgment on the failure-to-accommodate claim. For the reasons stated below,
the court GRANTS R1's motion for summary judgment on both counts and
DENIES Ms. Combs's motion for partial summary judgment.

I. BACKGROUND

St. Vincent Ascension Health (Ascension) hired Brenda Combs in 2016 as
a follow-up representative in its billing department. Ms. Combs suffered from
conditions such as diabetes and gastroparesis, which caused her to experience
intermittent nausea, vomiting, bowel issues, and abdominal pain. Ms. Combs
asked for accommodations to account for these conditions. She included a
November 2016 accommodation certification in which her doctor certified that

she needed frequent bathroom breaks and flexible scheduling for lunch. Ascension responded by allowing Ms. Combs to take flexible lunch breaks, take frequent trips to the restroom, and wear comfortable shoes.

R1 took over hospital billing for Ascension in 2017. R1 hired much of Ascension's personnel and moved them to different positions. In June 2017, R1 hired Ms. Combs as a patient financial services follow-up representative. Shortly thereafter, in August 2017, Ms. Combs submitted an accommodation request to R1, seeking the same accommodations she had at Ascension and including her 2016 accommodation certification. One of R1's human resources officers, Matt Hand, approved the accommodation request.

Throughout 2018, R1 reduced the number of patient financial services follow-up representative positions in the Indianapolis area where Ms. Combs worked. Then in November 2018, R1 informed Ms. Combs and one other patient financial services follow-up representative, Gelinda Brooks, that their positions would be eliminated, and they had twenty-four hours to accept new jobs as patient access insurance specialists, or they'd be terminated.

Ms. Combs and Ms. Brooks both accepted the new positions. Their supervisors were Ebony White (their direct supervisor), Morgan Belland (Ms. White's supervisor), and Latrenda Jones (Ms. Belland's supervisor).

As a patient access insurance specialist, Ms. Combs was responsible for confirming insurance coverage for patients. To monitor employee performance, R1 tracked "adherence" (whether employees kept to their 15-minute morning and afternoon breaks and 30-minute lunch break), quality of work, and productivity. To meet the productivity requirement, employees had to work a certain number of accounts per hour. During the first 90-day "ramp-up period," patient access insurance specialists had to average five accounts per hour after thirty days, seven accounts per hour after sixty days, and eight accounts per hour after ninety days. Employees could work accounts on the phone or online, depending on the insurance provider, though most work was by telephone.

In the days after Ms. Combs accepted the job, she corresponded with her new human resources officer, Daniela Zdravkovski, about accommodations. R1 approved flexible bathroom and lunch breaks, as requested, and dropped the adherence requirement. R1 maintained that the productivity requirement was essential for all patient access insurance specialists so R1 didn't drop that requirement for Ms. Combs; Ms. Combs had to meet her productivity requirement and stick to eight-hour shifts. R1 also agreed to let Ms. Combs transfer calls as needed and use the internet more than other employees, though

3

according to Ms. Combs she wasn't adequately trained on transferring calls and never had proper access to various websites.

On November 28, 2018, Ms. Combs began remote training, where she immediately expressed concerns to Ms. Belland that she'd miss the productivity requirement if she had to drop calls to use the restroom. On December 6, Ms. Belland and other managers met with Ms. Combs over the phone to discuss concerns about Ms. Combs's performance. According to Ms. Combs, during that call an unnamed manager laughed at her when she said she had to adjust her medication. On December 11, Ms. Combs emailed Ms. Belland to say that she felt unsettled by the December 6 meeting because she didn't know she was going to be "belittled and laughed at," and she accused Ms. Belland and others of making up her performance issues. She then also emailed Ms. Zdravkovski for a transfer to another position because she "didn't want the stress of being scrutinized."

Ms. Combs's 90-day ramp up period officially began on December 21, 2018. On January 15, 2019, Ms. Combs filed a complaint to the R1 Ethics Point Hotline, complaining that not all her accommodations had been provided and that she had been laughed at during the December meeting.

4

Ms. Combs's 30-day evaluation came in mid-January. On January 16, Ms. Belland emailed other supervisors to report that Ms. Combs wasn't meeting the productivity requirement. She provided Ms. Combs with an evaluation noting that she was behind in productivity. The two met on February 4, where Ms. Combs explained her difficulty accessing certain websites and Ms. Belland identified specific performance issues. Ms. Belland arranged for extra training on February 7, 2019, in which Ms. Combs was instructed on how to navigate insurance websites. Meanwhile, on January 17, Ms. Combs emailed Ms. Zdravkovski to report an "inappropriate comment" that Ms. Willhite made during the 30-day review. Ms. Combs's only elaboration was that when she told Ms. Willhite that she might be rushing, Ms. Willhite asked, "why do you have stuff to do around the house" and Ms. Combs responded, "I have bathroom issues."

Just before her 60-day evaluation, Ms. Combs emailed Ms. Zdravkovski again about a transfer, stating "I would like to be put in a different position to accommodate my health condition and not be under management that belittles me. I [saw] the doctor on [February 8] and he advised that I need to have some of this work stress eliminated." Ms. Zdravkovski replied with the company's transfer policy, which required twelve months' tenure before a transfer. Ms. Combs responded with a screenshot of the company's "Examples of Reasonable

Accommodations" and wrote "I should have been moved into a similar position like I had and qualify to perform." The email thread sat dormant until March 21, after Ms. Combs's 90-day evaluation.

Meanwhile at her 60-day evaluation, Ms. Combs was still below the productivity requirement—on February 19 she received an evaluation instructing her to apply what she learned in the extra training to help progress toward meeting the productivity requirement. Ms. Combs received extra training again on February 25. A trainer shadowed Ms. Combs, provided tips, and noted that Ms. Combs was near the goal while under observation—she reached seven accounts per hour and eight per hour was the eventual requirement.

On February 21, Ms. Belland emailed others in management to report that Ms. Combs and two other Patient Access Insurance Specialists weren't on track to meet the production requirement. She asked, "[is it] a possibility to term[inate] prior to them having their 90 day review or do we have to wait . . . ?" On March 8, Ms. Zdravkovski responded that they could fire the other two employees at ninety days, but to wait longer to terminate Ms. Combs since Ms. Zdravkovski was waiting to hear back from the legal department since Ms. Combs had a disability.

Ms. Belland gave Ms. Combs her 90-day evaluation on March 19, 2019, telling her that she was below her productivity requirements. Ms. Combs emailed Ms. Zdravkovski again on March 26 to request a transfer "to a position I am qualified for or [to] stop being harassed in this dep[artmen]t about my productivity, etc." Ms. Zdravkovski responded that evening, explaining that the productivity requirement applied to all associates at R1. She included the 12-month transfer policy in her response. The next morning, March 17, Ms. Combs responded with a screenshot of "Examples of Reasonable Accommodation" and requested a transfer, complaining that she shouldn't have been hired into a position that would be hard to perform with bathroom issues. Ms. Jones and Ms. Zdravkovski terminated Ms. Combs later that day. Ms. Combs exhausted her administrative remedies and this suit followed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In

deciding whether a genuine issue of material fact exists, we accept the non-movant's evidence as true and draw all inferences in his favor. Id. at 255. Nevertheless, the nonmoving party is not entitled to "[i]nferences that are supported by only speculation or conjecture." Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008) (citation omitted). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also Fed. R. Civ. P. 56(e)(2).

III. ANALYSIS

A.  Failure-to-Accommodate Claim

Ms. Combs and R1 both seek summary judgment on Ms. Combs's failure-to-accommodate claim. Ms. Combs argues that R1 violated the ADA by not engaging in the interactive process, refusing to drop the productivity requirement, and refusing to transfer her. R1 argues that Ms. Combs wasn't entitled to reasonable accommodations because she wasn't a qualified

8

individual, and that even if she was a qualified individual, R1 provided reasonable accommodations.

The Americans with Disabilities Act requires that employers provide reasonable accommodation for qualified individuals with disabilities. 42 U.S.C. § 12112(b)(5)(A). To establish a failure-to-accommodate claim, a plaintiff must show that (1) she is a qualified individual with a disability, (2) the employer knew of the disability, and (3) the employer didn't provide reasonable accommodations. Rowlands v. UPS, 901 F.3d 792, 798 (7th Cir. 2018). A qualified individual is someone who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). If a plaintiff can't show that she's a qualified individual, then she can't make a failure-to-accommodate claim because the ADA only requires reasonable accommodations for qualified individuals. Majors v. Gen. Elec. Co., 714 F.3d 527, 535 (7th Cir. 2013) (citing Gratzl v. Off. of the Chief Judges of the 12th, 18th, 19th & 22nd Jud. Cirs, 601 F.3d 674, 681 (7th Cir. 2010)).

A plaintiff establishes that she is a qualified individual by showing that she would satisfy legitimate prerequisites for the position and could perform the position's essential functions with or without accommodation. Ozlowski v.

Henderson, 237 F.3d 837, 839-840 (7th Cir. 2001) (citing Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 678 (7th Cir. 1998)). The plaintiff must present evidence of her own qualifications in comparison to the legitimate prerequisites of the position identified. Id. at 840.

When an employee is entitled to reasonable accommodation, the employer isn't required to provide the accommodation that the employee requests or prefers, so long as the employer does provide some reasonable accommodations. Swanson v. Vill. of Flossmoor, 794 F.3d 820, 827 (7th Cir. 2015). Relatedly, an employer can't be liable for not engaging in the interactive process if the employer nevertheless provides accommodations that are reasonable. Sassone v. Brennan, 917 F.3d 975, 980 (7th Cir. 2019). An employer satisfies its duty to accommodate when the employee is allowed to work in reasonable comfort. Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 546 (7th Cir. 1995). The ADA protects those could do their jobs if it weren't for their disability, not those who can't perform their job's essential functions for reasons unrelated to disability. Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 862 (7th Cir. 2005). In other words, an employee doesn't have an ADA failure-to-accommodate claim if they can't do the job even with reasonable accommodation. Id. Courts defer to employers' descriptions of a job's essential functions as long as the essential functions aren't

used as pretext for discrimination. <u>DePaoli v. Abbott Labs.</u>, 140 F.3d 668, 674 (7th Cir. 1998).

> *1. Whether Ms. Combs was a "qualified individual" based on her former job*

First, Ms. Combs argues that she was a qualified individual while working as a patient access insurance specialist because she had been a qualified individual as an Ascension patient financial services representative. She asked for accommodations when she worked for Ascension and was able to do the essential functions of her job with those accommodations. She argues that her success with reasonable accommodations in one position with Ascension makes her a qualified individual in a different position with R1.

Ms. Combs's status in a previous position isn't proof of status as a qualified individual in a new position. The relevant inquiry for a failure-to-accommodate claim isn't into positions previously held, but into the position an individual seeking accommodation "holds or desires." 42 U.S.C. § 12111(8). Whether a person is qualified for a job depends on the essential functions of that job, so when the person switches from one job to another, the person's status as qualified (or not) changes to reflect the essential functions of the new job. <u>Gratzl</u>

v. Off. of the Chief Judges of the 12th, 18th, 19th & 22nd Jud. Cirs, 601 F.3d 674, 679-680 (7th Cir. 2010). Even if someone is qualified for their first position, that person might no longer be qualified if they switch to a different position and can't fulfill the new position's essential function. Id. In short, a plaintiff "cannot prove that she is qualified for her current job simply by citing evidence that she was qualified for a previous job, with different essential functions, that has been eliminated." Id. at 680. Evidence that Ms. Combs was a qualified individual in her previous job with Ascension doesn't create a genuine issue as to whether she was qualified with R1.

### 2. Whether Ms. Combs was a "qualified individual" based on the position that she "currently holds" or "desires"

The parties don't dispute whether Ms. Combs was a qualified individual based on the position she held when she sought accommodations. According to R1, Ms. Combs didn't meet the patient access insurance specialist productivity requirements despite coaching, training, and providing workflow flexibility. Ms. Combs asked for transfers because she didn't think she was qualified for the patient access insurance specialist position and seems to concede that she was

12

unqualified for the patient access insurance specialist position in briefing. Instead, Ms. Combs claims that she was qualified for other positions.

Ms. Combs argues that she was a qualified individual because she would've been able to perform the essential functions of follow-up representative in a few other departments. She says she was qualified to work as a follow-up representative in the Physician Revenue group or as a Medicaid follow-up representative.

At the most general level, Ms. Combs claims that she was qualified for "any other Follow Up Representative position available in any department or business group at R1."  She explains that R1 indeed advertised openings for follow-up representatives and could have transferred her to those positions. She also states that "I knew from my experience that Follow Up positions are not on a fixed schedule, the number of accounts expected daily is 40, not 64, as in the [patient access insurance specialist] position, and telephone time for a Follow Up representative is far less than for a [patient access insurance specialist]."

While she claims personal knowledge of all the follow-up representative positions' qualifications, Ms. Combs' declaration doesn't support a finding that she had personal knowledge of these facts; she doesn't explain how working in one non-supervisory position made her aware of the qualifications of all

13

positions. See Fed. R. Evid. 602. Aside from these assertions, Ms. Combs doesn't point to any evidence that she could succeed in those roles, beyond similarity of title. As to whether she was met the position's prerequisites and could perform the essential functions, Ms. Combs's assertions that she was qualified don't set forth any reason why she was qualified but are conclusory and speculative, and don't raise a genuine issue of fact. See Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003).[1]

Ms. Combs identifies the Physician Revenue department representative as a desired role. As with her claim about "any other Follow Up Representative position," Ms. Combs doesn't provide evidence beyond her own belief that she could perform based on past experience. Without evidence of the desired role's prerequisites and essential functions, this evidence also amounts to conclusory assertions and speculation, and raises no genuine issue of material fact. See

---

[1] R1 cites Slowiak v. Land O'Lakes, Inc. for the proposition that "self-serving" affidavits should be discredited. 987 F.2d 1293 (7th Cir. 1993). Yet the court of appeals has since clarified that evidence mustn't be discredited for its "self-serving" nature and expressly overruled Slowiak and twenty-three other cases, to the extent that they prohibited "self-serving" evidence at summary judgment Hill v Tangherlini, 724 F.3d 965, 967 & n.1 (7th Cir. 2013). The court discredits Ms. Combs's statements, not for their self-serving nature, but for their insufficient bases in personal knowledge and speculative nature.

14

Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003). Ms. Combs cites to Mr. Hand's testimony that he didn't know what the prerequisites and essential functions on the Physician Revenue were and that he didn't know if Ms. Combs was qualified. But the plaintiff bears the burden of showing that she was a qualified individual, so Mr. Hand's inability to show that Ms. Combs wasn't qualified for a position doesn't create a genuine issue of material fact. See Taylor-Novotny v. Health All. Med. Plans, Inc., 772 F.3d 478, 493 (7th Cir. 2014).

Ms. Combs also identifies Medicaid follow-up representative as a position for which she was qualified. Ms. Combs has presented evidence that three other employees who had been in the same role as her were transferred to the Medicaid role. In Ms. Combs's supplemental declaration, she states that she assisted with Medicaid follow-up duties while employed by R1. She uses the earlier statement about all follow-up positions' requirements specifically for her Medicaid role argument, too. Ms. Combs doesn't provide any other evidence of the prerequisites of the role or how she could fulfil the role besides pointing to three coworkers who were transferred.

As with the Physician Revenue department position, the evidence for the Medicaid position doesn't create a genuine issue of material fact. A plaintiff must present evidence of the legitimate prerequisites of the position, of the essential

15

functions of the role, and that she could satisfy the prerequisites and the essential functions with or without reasonable accommodations. Ozlowski v. Henderson, 237 F.3d 837, 840 (7th Cir. 2001). Although she has presented some evidence of the essential functions (40 accounts per day) and says that she assisted with Medicaid duties, her only evidence for how she compared to the legitimate prerequisites and essential functions of the Medicaid job are that three coworkers transferred. That evidence doesn't show how Ms. Combs compared to those coworkers who were transferred or what the legitimate prerequisites of the job were. Nor does the evidence show that Ms. Combs could do the job with or without reasonable accommodations. Instead, the evidence presented would require a factfinder to infer what the Medicaid positions' prerequisites were, the capabilities of the transfer employees, and the comparative capabilities of Ms. Combs. Although Ms. Combs presents a bit more evidence as to the Medicaid role than the other roles, the evidence is still based on speculation and conjecture and would require a factfinder to depend on unreasonable inferences.

Despite all this, Ms. Combs claims that she doesn't need to give evidence of the prerequisites and essential functions of the jobs she desired because R1 refused to provide that information while she worked at R1. This argument mixes up the burden of an employer when a qualified individual seeks reasonable

16

accommodations and the burden on a plaintiff claiming discrimination during litigation. Ms. Combs is correct that under the ADA, an employer who doesn't engage in the interactive process might be liable for failing to provide reasonable accommodations. Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996). But despite the employer's obligation to engage during the employment relationship, the burden is on the plaintiff during litigation to show that the plaintiff was qualified. Taylor-Novotny v. Health All. Med. Plans, Inc., 772 F.3d 478, 493 (7th Cir. 2014). Regardless of whether R1 withheld information while Ms. Combs was an employee of R1, Ms. Combs has now had the benefit of discovery to get any such evidence. She can't now claim that her lack of evidence is R1's fault when she had the tools of discovery at her disposal. See Gile v. United Airlines, Inc., 95 F.3d 492 (7th Cir. 1996) (holding that plaintiff was entitled to broader discovery so that she could show she was qualified for vacant positions); Reisiger v. West, No. 99-3422, 2000 U.S. App. LEXIS 18173, at *5 (7th Cir. 2000).

   To find that Ms. Combs was qualified for other follow-up positions would either require a factfinder to rely on Ms. Combs's own statements that she was qualified, which are impermissibly speculative, or to unreasonably infer what the legitimate prerequisites and essential functions of the transfer jobs were.

17

Because a reasonable jury could not find for Ms. Combs on the issue of whether she was a qualified individual, Ms. Combs was not entitled to reasonable accommodations under the ADA and R1 is entitled to judgment as a matter of law on the failure-to-accommodate claim.

### 3. Whether R1 provided reasonable accommodation.

Aside from whether Ms. Combs was a qualified individual under the ADA, R1 is also entitled to judgment as a matter of law because Ms. Combs hasn't created a genuine issue as to whether R1 failed to reasonably accommodate her.

As an initial matter, R1 describes time on the phone and the productivity requirement as essential functions for the patient access insurance specialist position. Courts don't generally second-guess an employer's determination of a job's essential functions, Lloyd v. Swifty Transp., Inc., 552 F.3d 594, 601 (7th Cir. 2009), and Ms. Combs doesn't dispute that these were essential functions. Instead, Ms. Combs argues that R1 failed to provide reasonable accommodation when it didn't drop the productivity requirement or transfer her to another position.

Neither accommodation would've been reasonable. First, an employer isn't required to strip a current job of its essential functions, Gratzl v. Off. of the Chief

18

Judges of the 12th, 18th, 19th & 22nd Jud. Cirs, 601 F.3d 674, 680 (7th Cir. 2010), which is what Ms. Combs sought by requesting an exemption from the productivity requirement. Second, reassignment might be a reasonable accommodation when an employee can't perform the essential functions of a position, but only if the employee can identify a vacant position for which she was qualified. See Ozlowski v. Henderson, 237 F.3d 837, 840 (7th Cir. 2001); DePaoli v. Abbott Labs., 140 F.3d 668, 675 (7th Cir. 1998). As explained earlier, Ms. Combs hasn't shown that she was qualified for any desired position and that makes reassignment an unreasonable accommodation.

Relatedly, Ms. Combs argues that R1 failed to accommodate her because Ms. Zdravkovski continually treated her request for transfer as unrelated to her disability. She argues she was denied the accommodation she deserved because Ms. Zdravkovski acted in bad faith and frustrated the interactive process. Whether Ms. Zdravkovski acted in bad faith and frustrated the interactive process is irrelevant, however, because failure in the interactive process only matters if the employee was qualified for the job. Stern v. St. Anthony's Health Ctr., 788 F.3d 276, 292-294 (7th Cir. 2015). Because Ms. Combs hasn't raised a genuine issue that she was qualified for the patient access insurance specialist

19

position or transfer positions, the extent to which R1 engaged in the interactive process makes no difference.

R1 provided Ms. Combs with flexible lunch breaks and bathroom breaks, as she asked in her accommodation certification, and provided extra training and dropped the adherence requirement. These accommodations reasonably accommodated her disability because they enabled Ms. Combs to work in relative comfort. See Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 546 (7th Cir. 1995). Ms. Combs's request for exemption from the productivity requirement and request for transfer are both unreasonable and she has not raised any genuine dispute as to whether R1 failed to reasonably accommodate her.

## B. Retaliation Claim

Ms. Combs's second claim against R1 is for retaliation. She claims that R1 retaliated against her by terminating her after she lodged a complaint to the Ethics Points Hotline regarding ADA accommodations and asked for a job transfer.

The ADA prohibits employers from retaliating against employees who engage in protected ADA activities. 42 U.S.C. § 12203(a). Importantly for Ms. Combs, a plaintiff alleging retaliation under the ADA doesn't need to be a

20

qualified individual, since the retaliation provision applies to "any individual." Rodrigo v. Carle Found. Hosp., 879 F.3d 236, 243 (7th Cir. 2018) (citing 42 U.S.C. § 12203(a)). A plaintiff can prevail on a claim of retaliation by showing (1) that the plaintiff engaged in protected activity under the ADA, such as seeking an accommodation, (2) that the plaintiff suffered an adverse employment action, and (3) a causal connection between the two. Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011). A plaintiff can show causation with circumstantial evidence, such as evidence of suspicious timing, evidence that similarly situated employees were treated differently, and evidence that the employer's stated reasons for the adverse employment action were pretextual. Castro v. DeVry Univ., Inc., 786 F.3d 559, 564-565 (7th Cir. 2015). Suspicious timing between a protected activity and an adverse employment action generally is insufficient to show causation, Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2006), though a mere matter of days might be enough to show causation. McClendon v. Ind. Sugars, Inc., 108 F.3d 789, 796-797, 797 nn.5-6 (7th Cir. 1997). Ultimately, the legal standard for a retaliation claim is whether the evidence would permit a reasonable factfinder to conclude that the protected activity caused the adverse employment action. Rowlands v. UPS, 901

F.3d 792, 801 (7th Cir. 2018) (citing Ortiz v. Werner Enters., Inc., 834 F.3d 760, 764 (7th Cir. 2016)).

The parties don't dispute that Ms. Combs's termination was an adverse employment action or that contacting the Ethics Point Hotline and emailing Ms. Zdravkovski about accommodations were protected activities (although they dispute whether Ms. Combs's requests all related to her disability). See Rodrigo v. Carle Found. Hosp., 879 F.3d 236, 243 (7th Cir. 2018). The parties instead dispute whether there was a causal connection between protected activity and Ms. Combs's termination.

Ms. Combs relies on the timing of her final request for a transfer and her termination to show causation. She points to her March 26 and 27 emails with Ms. Zdravkovski requesting a transfer, right before Ms. Zdravkovski and Ms. Belland terminated Ms. Combs on March 27. Ms. Combs argues that this is an example of an "extreme case" where suspicious timing along can create a genuine dispute of fact. Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2009). In Casna v. City of Loves Park, the employer recommended firing the employee one day after she engaged in protected activity and she was fired a few days later. Id. The court held that even though the employee's "ongoing failure to meet the

22

[employer's] expectations had already made her a candidate for termination," there might still be causation. Id.

The timing of Ms. Combs's emails and her termination are meaningfully different than in Casna and don't create a genuine issue of causation. In Casna, the employee had received some negative evaluations before engaging in protected activity, but the employer didn't decide to terminate the employee until after the protected activity. In this case, emails between Ms. Belland, Ms. Zdravkovski and others show that they wanted to fire Ms. Combs in mid-February and only delayed firing her to finish the 90-day ramp up period. The suspicious timing only arose because R1 delayed firing Ms. Combs; she can't show that her request caused her termination when the decision to terminate her was already made. Relatedly, Ms. Combs's claims that her earlier emails with Ms. Zdravkovski and her Ethics Point Hotline complaint caused her termination don't show causation since they aren't the "extreme case . . . where the adverse impact comes on the heels of the protected activity." Id. at 427 (quotations omitted).

Aside from timing, Ms. Combs claims that R1's stated reason for firing her was pretext because Ms. Zdravkovski and others didn't warn her that they were about to fire her or tell her in advance that they were firing her for poor

23

performance. R1 wasn't obligated to tell Ms. Combs in advance that they decided to fire her, and the undisputed evidence shows that Ms. Combs's several evaluations put her on notice of her subpar performance.

Finally, not only does the evidence show that R1 didn't treat employees who didn't engage in protected activity better, but R1 treated them worse. On February 21, Ms. Belland recommended firing both Ms. Combs and Ms. Brooks from the patient access insurance specialist role. Ms. Brooks didn't engage in protected activity and was fired before her 90-day evaluation in March. Ms. Combs wasn't treated worse than coworkers who didn't engage in protected activity, but indeed R1 treated Ms. Combs better than a similarly situated coworker by delaying firing her.

Ms. Combs hasn't presented evidence that her firing was caused by her protected activity beyond suspicious timing and hasn't accounted for a similarly situated coworker who was actually treated worse but didn't engage in protected activity. The evidence in the summary judgment record wouldn't permit a reasonable factfinder to conclude that the protected activity caused the adverse employment action, and R1 is entitled to judgment on Ms. Combs's retaliation claim. See Rowlands v. UPS, 901 F.3d 792, 801 (7th Cir. 2018)

24

## IV. CONCLUSION

To prevail on a failure-to-accommodate claim, Ms. Combs had to show that she was a qualified individual and that R1 failed to provide reasonable accommodations. R1 is entitled to judgment as a matter of law on the failure-to-accommodate claim because she hasn't raised a genuine issue for either element. Similarly, Ms. Combs would need to show that engaging in protected activity caused her termination to prevail on the retaliation claim. Ms. Combs hasn't raised a genuine issue as to causation and R1 is therefore entitled to judgment on the retaliation claim. The court GRANTS R1's motion for summary judgment [Doc. No. 32] and DENIES Ms. Combs's motion for partial summary judgment [Doc. No. 36].

SO ORDERED.

ENTERED:   September 24, 2021


    /s/ Robert L. Miller, Jr.
Judge, United States District Court


Distribution:  All Electronically registered counsel of record

25